[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13368

Non-Argument Calendar

_____

STATE OF GEORGIA,

Plaintiff-Appellee,

*versus*

JEFFREY BOSSERT CLARK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03721-SCJ

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and GRANT, Circuit Judges.

PER CURIAM:

Jeffrey Clark appeals the order remanding his state criminal prosecution for conspiring to interfere in the 2020 presidential election and denying his request to remove the special purpose grand jury proceeding that preceded his criminal indictment. Clark argues that he is entitled to remove his state prosecution based on federal-officer jurisdiction, 28 U.S.C. § 1442(a)(1), and the special purpose grand jury proceeding based on federal-question jurisdiction, *id*. §§ 1331, 1441(a). We affirm.

## I. BACKGROUND

Jeffrey Clark served as the Assistant Attorney General for the Environmental and Natural Resources Division of the Department of Justice and as the Acting Assistant Attorney General for the Department's Civil Division when former President Donald Trump lost his bid for reelection in November 2020. In May 2022, a special purpose grand jury was impaneled in Fulton County, Georgia, to conduct a criminal investigation into "possible attempts to disrupt the lawful administration of the 2020 elections in" Georgia and to prepare a report and recommendation "concerning criminal prosecution as it shall see fit." *See* O.C.G.A. § 15-12-100. In January 2023, after issuing its final report, the special purpose grand jury was dissolved. *See id*. § 15-12-101(b). The final report was published.

On August 14, 2023, a distinct Fulton County grand jury charged Clark, Trump, and 17 other defendants with crimes relating to election interference in the 2020 presidential election. The indictment charged Clark with violating two state laws: the Georgia Racketeer Influenced and Corrupt Organizations Act, *id.* § 16-14-4(c), and criminal attempt to commit false statements and writings, *id.* §§ 16-4-1, 16-10-20. The indictment alleged that Clark committed these crimes by knowingly and willfully making a false writing stating that the Department had identified "significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia" and by asking two Department officials to join him in signing and issuing the false writing to Georgia officials.

Clark filed a notice of removal in the district court, *see* 28 U.S.C. § 1455, based on federal-officer jurisdiction, *see id.* § 1442(a)(1). He argued that he "was a high-ranking U.S. Justice Department official," the allegations related "directly to his work at the Justice Department as well as with the former President," and he had colorable federal defenses. Clark also sought to remove the special purpose grand jury proceeding that preceded his criminal indictment based on federal-question jurisdiction, *see id.* §§ 1331, 1441, and as a "civil in nature" action that was "ancillary" to his criminal prosecution, *see id.* § 1442(d)(1).

The district court ordered an evidentiary hearing. At the hearing, the parties disputed whether the federal-officer removal statute applies to former federal officers. The district court received

evidence that included testimony from live witnesses and declarations from Clark and former Attorney General Edwin Meese, III, supporting Clark's request for removal.

The district court declined to assume jurisdiction over Clark's criminal prosecution and denied his request to remove the special purpose grand jury proceeding. Without the benefit of our decision in *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), the district court ruled that Clark was not entitled to removal because he failed to establish a causal connection between his alleged criminal conduct and his former office. It declined to address whether he had a colorable federal defense. And it denied Clark's request to remove the special purpose grand jury proceeding because, even if the proceeding were removable, Clark failed to establish a basis for removal. It also declined to allow removal because the proceeding had concluded.

## II. STANDARDS OF REVIEW

We review issues of removal jurisdiction *de novo*. *See Meadows*, 88 F.4th at 1338. We review whether an issue is moot *de novo*. *See Cook v. Bennett*, 792 F.3d 1294, 1298 (11th Cir. 2015).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that section 1442(a)(1) does not provide Clark, as a former officer, a right of removal to federal court. Second, we explain that the issue whether the special purpose grand jury proceeding was removable is moot.

### A. Clark Was Not Entitled to Federal-Officer Removal, 28 U.S.C. § 1442(a)(1).

The federal-officer removal statute, 28 U.S.C. § 1442(a)(1), "provides a right of removal to federal court if a defendant proves that he is a federal officer, his conduct underlying the suit was performed under color of federal office, and he has a 'colorable' federal defense." *Meadows*, 88 F.4th at 1338. The statute applies only to current officers. *See id.* at 1335–38 (holding that Clark's codefendant Mark Meadows, a former federal officer, was not entitled to removal under the federal-officer removal statute). As a former officer, Clark cannot remove his criminal prosecution under section 1442(a)(1).

As we explained in *Meadows*, the text and history of the removal statute make clear that the statute applies only to current "officer[s] . . . of the United States," 28 U.S.C. § 1442(a)(1). Clark does not argue that he is a current federal officer. So under *Meadows*, which we are bound to follow, he is ineligible to seek removal under section 1442(a)(1). *See Meadows*, 88 F.4th at 1338; *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (A "prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*."); *see also United States v. Lee*, 886 F.3d 1161, 1163 n.3 (11th Cir. 2018). We need not decide whether his alleged conduct was performed under color of his office or whether the district court abused its discretion in weighing the evidence. *See United States v. Bane*, 948 F.3d 1290, 1294 (11th Cir. 2020) (We "may affirm for any reason supported by the record.").

*B. The District Court Did Not Err in Rejecting Clark's Request to Remove the Concluded Special Purpose Grand Jury Proceeding.*

Clark argues that the special purpose grand jury proceeding was removable based on federal-question jurisdiction, 28 U.S.C. §§ 1331, 1441(a), because the proceeding was "completely preempted" by federal law and is not moot. But we disagree. Federal courts lack authority to decide moot questions or abstract propositions or to declare principles or rules of law that cannot affect the case before it. *Zinni v. ER Sols., Inc.*, 692 F.3d 1162, 1166 (11th Cir. 2012). An issue is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011).

Regardless of whether the proceeding could have been removed during the investigation, the removability of the proceeding is moot because it no longer presents a "live controversy." *Id.* Clark identifies no concrete interest in having the "case" heard now by a federal court, nor could he. The special purpose grand jury issued its final report and was dissolved over seven months before another grand jury indicted Clark and before he sought removal. And the special grand jury was not responsible for indicting Clark in the first place. *See Kenerly v. State*, 715 S.E.2d 688, 691 (Ga. Ct. App. 2011) (explaining that a special purpose grand jury does not have "the power to indict following its investigation" and that Georgia law anticipates "that the special grand jury be dissolved upon the completion of the investigation or upon the issuance of a report"); O.C.G.A. § 15-12-100 *et seq.*

## IV. CONCLUSION

We **AFFIRM** the order remanding Clark's criminal action to state court and denying his request to remove the special purpose grand jury proceeding.

ROSENBAUM, Circuit Judge, Concurring:

I agree with the Majority Opinion that Jeffrey Clark cannot remove his Georgia criminal prosecution to federal court under 28 U.S.C. § 1442(a)(1) (the "federal-officer removal statute") because he is a former federal officer, and we have held that § 1442(a)(1) does not apply to former federal officers. But even if § 1442(a)(1) covered former federal officers, Clark still could not remove his Georgia prosecution to federal court under that statute.

The federal-officer removal statute is not a get-out-of-state-court-free card for federal officers. It allows a federal officer to remove his criminal prosecution from state court to federal court only if the action is "for or relating to any act under color of [their] office." 28 U.S.C. § 1442(a)(1). But none of Clark's charged conduct falls within the job description of his former positions as a federal officer. So Clark can't satisfy the removal statute.

To be sure, Clark indisputably served as a federal officer. Between November 2018 until January 2021, Clark served as the Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") of the United States Department of Justice ("DOJ"). Beginning in September 2020, he also served as Acting Assistant Attorney General for DOJ's Civil Division.

But Georgia alleges that Clark, along with former White House Chief of Staff Mark Meadows and several others, conspired to interfere with the results of the 2020 Presidential election, in violation of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") Act. It also asserts that Clark criminally attempted

to commit the offense of making false statements and writings by preparing and attempting to send Georgia a letter from the United States Department of Justice ("DOJ") that falsely purported to identify "significant concerns that may have impacted the outcome of the election in . . . Georgia." The letter also falsely claimed that DOJ "recommend[ed] that the Georgia General Assembly should convene in special session" to "evaluate irregularities in the 2020 election" and "take whatever action is necessary" if the "election failed to make a proper and valid choice."

The problem for Clark is that these alleged criminal acts bear no connection to either of his positions at the United States Department of Justice. Indeed, the district court found that neither DOJ's Assistant Attorney General for ENRD nor its Acting Assistant Attorney General for the Civil Division handles election-related affirmative investigations or litigation. That's the role of the Assistant Attorney General of DOJ's Civil Rights Division and to a certain extent, the Attorney General of DOJ's Criminal Division—different presidentially nominated and Senate-confirmed appointees. And the record here doesn't allow for the conclusion that the district court clearly erred in its factual findings. Under the federal-officer removal statute and *Georgia v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), that is fatal to Clark's removal effort.

As we recently explained in *Meadows*, to remove state charges to federal court under the federal-officer removal statute, a federal officer bears the burden of showing "a 'causal connection between the charged conduct and asserted official authority.'" *Id.*

at 1343 (quoting *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999)). We concluded in *Meadows* that Meadows failed to satisfy that burden. *Meadows*, of course, binds us here. And it is especially relevant because it discusses not only the framework for evaluating federal officers' attempted removals of state charges, but also the nature of the conspiracy that Georgia alleges both Meadows and Clark participated in.

I divide my discussion of why Clark's removal effort fails under the federal-officer removal statute and *Meadows* into four parts. Section I reviews the relevant aspects of *Meadows*. Section II identifies the acts that Georgia charged Clark with. Section III explains that Clark's official responsibilities, just like Meadows's, "did not include superintending state election procedures." *Id*. And Section IV shows that Clark's charged conduct was "not related to his office[s]" at DOJ. So even if the federal-officer removal statute applied to former officers, Clark could not remove his Georgia prosecution to federal court under that law.

**I.    *Meadows* governs the analysis of whether Clark has satisfied his burden to show that he committed the alleged acts under "color of [federal] office," 28 U.S.C. § 1442(a)(1).**

We thoroughly discussed the facts in *Meadows* in that opinion. *See Meadows*, 88 F.4th at 1335–38. I summarize them here only

as relevant to our evaluation of Clark's attempted removal of his Georgia charges.

A Fulton County grand jury charged Meadows, Clark, and sixteen others with, among other things, conspiracy to "change the outcome of the [2020] election in favor of Trump." *Id.* at 1335. Meadows sought to remove the case to federal court under the federal-officer removal statute. *Id.* at 1336. The district court denied summary remand and ordered an evidentiary hearing. *Id.* (citing 28 U.S.C. § 1455(b)(5)). After considering the evidence, the district court denied removal and remanded to Georgia state court. *Id.* at 1337. On appeal, we affirmed the district court's remand. *Id.* at 1350.

As relevant here, we explained that to remove a state action to federal court under the federal-officer removal statute, a federal officer bears the burden of "establish[ing] a 'causal connection between the charged conduct and asserted official authority.'" *Id.* at 1343 (quoting *Acker*, 527 U.S. at 431). In assessing whether the federal officer has done so, we said, we "identify the 'act' or charged conduct underlying [the state's] prosecution, the scope of [the officer's] federal office, and the existence of a causal nexus between [officer's] conduct and his office." *Id.* at 1343–44.

We then considered these steps as they applied to the conspiracy count against Meadows. At the first step—identifying the "act"—we explained that when we evaluate a conspiracy count, "we must look to the 'heart' of Meadows's conduct to determine whether his section 1442(a)(1) 'act' . . . supports removal." *Id.* at

1345. Using that methodology, we identified Meadows's alleged conspiracy act to be "conspiring to 'unlawfully change the outcome of the election in favor of Trump.'" *Id.*

Turning to the scope of Meadows's formal office, we said that "[t]he 'color of office' element requires acts to be done 'in enforcement of federal law.'" *Id.* (citing *Mesa v. California*, 489 U.S. 121, 131–32 (1989)). We explained that, in addressing this element, a federal officer "must identify a source of positive law for his assertions of official authority for us to determine whether his alleged acts were attributable to exercises of that authority." *Id.* "[O]ur judicial duty [then] demands an independent assessment of the limits of [the federal officer's] office." *Id.* at 1346.

We noted that Meadows identified no statutory source of law that empowered the White House Chief of Staff to regulate or supervise state voting procedures in federal elections. *Id.* at 1346–47. And when Meadows pointed to DOJ's Civil Rights Division and its Election Crimes Branch within its Criminal Division as sources of positive legal authority, we said he "fail[ed] to explain how the duties of his office or his charged conduct implicated either division of the Department." *Id.* at 1347. We similarly found unavailing his reliance on the Constitution's Take Care Clause, U.S. CONST. art. II, § 3, as "empower[ing] the President with broad authority to 'ensure that federal voting laws are enforced.'" *Id.* As we explained, "the President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections." *Id.* "And tellingly," we observed, Meadows

cited "no legal authority for the proposition that the President's power extends to 'assess[ing] the conduct of state officials.'" *Id.* Indeed, we said, we were "aware of no authority suggesting that the Take Care Clause empowers federal executive interference with state election procedures based solely on the federal executive's own initiative, and not in relation to another branch's constitutionally authorized act." *Id.*

As to the causal-nexus requirement, we emphasized that a federal officer "must be 'specific and positive' in showing that his charged conduct 'was confined to his acts as an officer.'" *Id.* at 1348 (quoting *Colorado v. Symes*, 286 U.S. 510, 520 (1932)). Not only that, we explained, but "in 'a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts.'" *Id.* (quoting *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969)). We affirmed the district court's conclusion that Meadows "failed to 'provide sufficient evidence' that his association with the alleged conspiracy was 'related to any legitimate purpose of the executive branch.'" *Id.* In reaching this conclusion, we remarked that "the district court was entitled to evaluate the demeanor and presentation of witnesses, assess the credibility of testimony including Meadows's, and weigh competing evidence." *Id.* Ultimately, we held that Meadows had failed to establish a "'causal connection' between

[his] 'official authority' and his alleged participation in the conspiracy." *Id*. at 1349.

With *Meadows* firmly in mind, I explain why Clark's attempted removal meets the same fate as Meadows's.

**II.    Clark's alleged acts include conspiring to overturn the 2020 presidential election, drafting a false letter to Georgia officials, and trying to cause that false letter to be sent to Georgia officials.**

I start with the first step of *Meadows*: "identify[ing] the 'act' or charged conduct underlying [the state's] prosecution," *id*. at 1343. The acts underlying Clark's charges are simple to identify.

Under the RICO charge, which Clark shares with Meadows for the same conspiracy, we found that the underlying act "was [Meadows's] alleged association with the conspiracy to overturn the presidential election." *Id*. at 1344. We explained that in assessing whether conspiratorial "association" relates to an officer's position, we consider the "heavy majority of overt acts" the officer allegedly committed in furtherance of the conspiracy. *Id*.

Here, Georgia asserted that Clark committed four overt acts in furtherance of the conspiracy. Act 98 alleged that, on or about December 28, 2020, Clark attempted to commit the felony offense of making false statements and writings, in violation of GA. CODE ANN. § 16-10-20. More specifically, Act 98 alleged Clark wrote a letter on behalf of DOJ "knowing [it] contain[ed] the false statement that [DOJ] had 'identified significant concerns that may have impacted the outcome of the [2020 presidential] election in . . .

Georgia." Act 98 continued, asserting that Clark sent Acting U.S. Attorney General Jeffrey Rosen and Acting U.S. Deputy Attorney General Richard Donoghue an email seeking authorization to send the "false writing" to Georgia Governor Brian Kemp, Speaker of the Georgia House of Representatives David Ralston, and President Pro Tempore of the Georgia Senate Butch Miller.

Relatedly, Act 99 alleged that, also on or about December 28, 2020, Clark solicited Rosen and Donoghue to sign the same "false" letter Act 98 described and send it to Kemp, Ralston, and Miller.

Act 110 asserted that, on or about January 2, 2021, Clark received a call from codefendant Scott Graham Hall[1] and, in a 63-minute-long conversation, discussed the November 3, 2020, election.

And returning to the "false" letter that Act 98 described, Act 111 alleged that, on January 2, 2021, Clark again sought for Rosen

---

[1] Among other overt acts, the Indictment charged Hall with, on or about January 7, 2021, "committ[ing] the felony offense of INTERFERENCE WITH PRIMARIES AND ELECTIONS, in violation of [Ga. Code. Ann.] § 21-2-566, . . . by willfully and unlawfully tampering with electronic ballot markers and tabulating machines in Coffee County, Georgia." Relatedly, it alleged Hall committed the Georgia felony offenses of unlawful possession of ballots, computer theft, computer trespass, computer invasion of privacy, and conspiracy to defraud the state.

and Donoghue to sign that document and to send it to Kemp, Ralston, and Miller.

Finally, Count 22 of the indictment separately charged Clark with the felony offense of criminal attempt to commit false statements and writings, in violation of GA. CODE ANN. §§ 16-4-1 & 16-10-20, for the same acts alleged in Acts 98, 99, and 111 of the conspiracy count.

### III.    Clark's official responsibilities, just like Meadows's, "did not include superintending state election procedures."

In *Meadows*, we established that "[a]cts taken under color of office are those [that are] 'vested with, or appear to be vested with, the authority entrusted to that office.'" *Id.* at 1345 (quoting *Color of Office*, BLACK'S LAW DICTIONARY (11th ed. 2019)).  They must be "in enforcement of federal law[,]" *id.* (quoting *Mesa*, 489 U.S. at 131–32), and the officer "must identify a source of positive law for his assertions of official authority for us to determine whether his alleged acts were attributable to exercises of that authority."  *Id.*

At no point in the litigation has Clark argued that his role as head of ENRD is relevant to this removal request.  That was a wise choice; ENRD focuses on environmental statutes like, for example, the Clean Water Act, 33 U.S.C. § 1251, the Clean Air Act, 42 U.S.C. § 7401, and the Toxic Substances Control Act of 1976, 15 U.S.C. § 2601.  U.S. Dep't of Just., Just. Manual § 5-6.130 (2018).  And

regulating or supervising state voting procedures in federal elections has nothing to do with toxic substances regulated by federal law.

On appeal, Clark seems to have also mostly abandoned his arguments that his post atop DOJ's Civil Division related to monitoring elections. Another wise decision. As former Trump Administration Assistant Attorney General for the Civil Division, Jody Hunt, testified, the Civil Division mostly "defend[s] suits that are filed against the United States or officers of the executive branch." Hunt further explained that "[a]nything with respect to election irregularities or voter discrimination would either fall to the Civil Rights Division or to the Criminal Division."[2]

So Clark instead argues that, as an Assistant Attorney General, his position was "fungible," and the President or DOJ

---

[2] Clark argues the district court acted inappropriately by giving weight to former Assistant Attorney General Hunt's testimony because Hunt "left DOJ months before the 2020 election." At the same time, Clark takes the contradictory position that the district court should have given more weight to an affidavit from former Attorney General Edwin Meese III based on Meese's personal experience at DOJ "that occurred decades before Mr. Clark's service in the Trump administration." Hunt was Clark's direct predecessor in the Trump administration. His testimony was subject to live cross-examination. And we have no basis to conclude that the district court clearly erred when it found Hunt's testimony highly credible and gave less weight to Meese's affidavit because of its decades-long temporal distance from the events Georgia alleged. *See Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1293 (11th Cir. 2024) (noting our review of a district court's factual findings is "only for clear error," and "[a] district court's credibility determination gets special deference, and we accept it unless it is contrary to the laws of nature, or is so

leadership could assign him more duties outside his Divisions. Clark urges that confining his duties to those as head of ENRD or the Civil Division would be tying him "to a stovepipe." And as Clark tells it, the President or DOJ leadership could assign him duties with election-related issues.

Clark is right that the statute governing the appointment of Assistant Attorneys General provides only that they "assist the Attorney General in the performance of his duties." 28 U.S.C. § 506. So it's plausible that this broad statutory language could permit the President or the Acting Attorney General to assign Clark responsibilities related to election law. And under *Acker*, we are obligated to "credit[] a plausible reading of a specific legal authority[]" offered by the removing officer. *Meadows*, 88 F.4th at 1346 (emphasis omitted).

But even after we accept Clark's reading of this statute, he still must identify "a source of positive law for his assertions of official authority." *Id.* at 1345. To do that, at the very least, Clark must show that (1) DOJ has legal authority to do what Clark did and (2) his superiors in fact assigned him authority to take the actions he's alleged to have engaged in. He has not done so. And as we explained in *Meadows*, "*Acker* does not instruct us to blindly

---

inconsistent or improbable on its face that no reasonable factfinder could accept it" (citation omitted)).

accept an expansive proclamation of executive power relying on no source of positive law." 88 F.4th at 1346.

### A. The President and DOJ did not delegate Clark authority to intervene in Georgia's election.

Clark offers three potential sources of delegated authority relevant to his removal effort: the White House Chief of Staff, DOJ leadership, and the President. None work.

*First*, Clark highlights that Meadows, as White House Chief of Staff, "specifically directed the Acting Attorney General to have Clark investigate Fulton County, Georgia signature matching problems."

This is not a plausible claim of authority. We held in *Meadows* that "neither the Constitution, nor statutory law, nor precedent prescribe any role for the White House chief of staff" in "superintend[ing] the states' administration of elections." *Id*. Meadows was not authorized by law to direct that Clark investigate Georgia's elections. So Clark can't claim Meadows's alleged orders as authority.

*Second*, Clark asserts that the Acting Attorney General authorized him to (1) receive a national security briefing, (2) review a classified report on potential foreign election interference, and (3) consult with the U.S. Attorney for the Northern District of Georgia

on law-enforcement matters.  But this is not a plausible claim of delegated authority to write the charged letter, either.

For starters, Clark drafted the letter at issue here before the Acting Attorney General made these authorizations.  Not only that, but Acting Attorney General Rosen, only after Clark's persistence with the letter, authorized the briefing and suggested Clark speak to the U.S. Attorney to show there was *no* evidence of voter fraud.

Even Rosen testified that he found Clark's drafted letter "strange" because Clark "didn't have responsibility over election issues."  In Rosen's view "there were so many problems with [Clark's drafted letter]," including that "it's not the Justice Department's responsibility" to superintend state election procedures.

Acting Deputy Attorney General Donoghue also responded to Clark's letter.  He told Clark it was not DOJ's role to offer "recommendations to a State Legislature about how they should meet their Constitutional obligation to appoint Electors."  In fact, Donoghue went so far as to tell Clark his letter was "wildly inappropriate and irresponsible" and "nothing less than the Department meddling in the outcome of a presidential election."

Against this testimony, the district court found that "the specific contents of the December 28 letter were not within the scope of [DOJ's] authority more broadly."  Clark has not made a plausible showing that DOJ leadership directed him to superintend state

elections.  Indeed, I can't say that the district court clearly erred in concluding DOJ leadership did not authorize Clark's acts.

And *third*, Clark claims that he had been "assigned duties at the White House and the President directly consulted with him about the 2020 election."  With this statement, he seems to suggest that the President directly delegated him authority to superintend Georgia's elections.  But the district court found that Clark offered no persuasive evidence that the President delegated him such authority.  To the contrary, the district court found that the President was not involved "in this letter specifically until the January 3 meeting when the President decided not to send it to the Georgia officials."[3]  Again, nothing in the record allows for the conclusion that the district court's factual finding was clearly erroneous.

Perhaps for this reason, Clark argues that the law doesn't require him to show that the President delegated him the authority

---

[3] According to Rosen and Donoghue, the January 3, 2021, meeting, held at Rosen's request, included President Trump, White House Counsel Pat Cipollone, Deputy White House Counsel Pat Philbin, Assistant Attorney General for the Office of Legal Counsel Steve Engel, White House lawyer Eric Herschmann, Rosen, Donoghue, and Clark.  At the meeting, the President considered whether to appoint Clark Acting Attorney General and send the letter to Georgia officials.  Only Clark advocated for his position.  Donoghue testified that when President Trump was advised there would be mass resignations at DOJ if he appointed Clark and sent the letter, he chose not to.  According to Donoghue, at the conclusion of the discussion, President Trump told Clark, "I appreciate you being willing to do this.  I appreciate you being willing to step up and take all the abuse . . . .  We're going to have mass resignations.  It's going to be a disaster . . . .  So we're not going to do this."  Donoghue further claims that Trump asked him if he was going to fire Clark, which Donoghue

to draft the letter.  He asserts that proving the delegation would require revealing privileged communications.

But Clark, as the removing officer, bears the burden to establish the scope of his office as relevant to his removal claim.  *See Meadows*, 88 F.4th at 1345.  That showing is especially important when his two offices typically have nothing to do with state elections.  And the bottom line is he didn't make that showing.

### B. DOJ had no authority to intervene in Georgia's elections.

What's more, even assuming Clark could show his superiors gave him authority to intervene in Georgia's elections, he still has not presented "a source of positive law for his assertions of official authority."  *Id.*  As Rosen and Donoghue correctly testified, DOJ as a whole could not lawfully interfere in Georgia's 2020 presidential election.

As we recognized in *Meadows*, the Constitution gives no express role to the President in overseeing election procedures; it "empowers only the states and Congress to 'regulate the conduct of [federal] elections.'"  *Id.* at 1346 (alteration in original) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)); *see* U.S. CONST. art. I, § 4, art. II, § 1.  We must reiterate that "[t]he states are responsible for enacting 'a complete code for . . . elections,' including 'regulations relati[ng] to . . . prevention of fraud and corrupt practices

―――――――――――――――

said he had no authority to do.  In response, Trump allegedly stated he was not going to fire Clark.

[and] counting of votes.'"   *Id.* (alterations in original) (quoting *Moore v. Harper*, 60 U.S. 1, 29 (2023)).

The Framers of our Constitution recognized that if the President had constitutional authority over the procedures used for his own election, he might abuse his office to ensure reelection.  To mitigate that risk, federal officers are constitutionally barred from serving as presidential Electors.  *See* U.S. CONST. art. II, § 1, cl. 2. As Hamilton articulated in Federalist No. 68, federal officers "might be suspected of too great devotion to the President in office."

So for good reason, the President's broad Take Care Clause authority does not extend to directing state election procedure.  As we explained in *Meadows*, "we are aware of no authority suggesting that the Take Care Clause empowers federal executive interference with state election procedures based solely on the federal executive's own initiative."  88 F.4th at 1347.

DOJ recognizes these limitations.  The Justice Manual, which contains DOJ policy, states as much:

> The Department has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts.  The Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with

election administration, tabulation, validation, or certification.

U.S. Dep't of Just., Just. Manual § 9-85.300 (2022).

For the President to get directly involved with state election authorities, Congress needs to at least have told him to do so.[4]  But Clark offers no law Congress enacted that gave the President or DOJ power to intervene in Georgia's elections.  And we are not aware of any such statute.

Notably, Clark does not cite the statutes enforced by DOJ's Civil Rights Division, which contains the Voting Section.  Those federal laws include

> provisions of the Voting Rights Act of 1965, 52 U.S.C. §§ 10301 to 10702; Voting Accessibility for the Elderly and Handicapped Act of 1984, 52 U.S.C. §§ 20101 to 20107; Uniformed and Overseas Citizens Absentee Voting Act of 1986, 52 U.S.C. §§ 20301 to 20311; National Voter Registration Act of 1993, 52 U.S.C. §§ 20501 to 20511; Help America Vote Act of 2002, 52 U.S.C. §§ 21081 to 21085, 21111; and the Civil

---

[4] Congress's constitutional authority to enact statutes interfering with a state's chosen process of appointing Electors can be powerful, but it is also limited. *See Georgia v. Shafer*, 23-13360 (11th Cir. 2024) (Rosenbaum, J., concurring). The President could not regulate elections based on an unconstitutional law.

Rights Acts of 1957 and 1960, 52 U.S.C. §§ 10101, 20701 to 20706.

U.S. Dep't of Just., Just. Manual § 8-2.270 (2022). The Voting Section investigates and files complaints against state authorities for violations of these statutes. *Id.* But the statutes focus on civil-rights violations. None are concerned with purported voter fraud.

For its part, DOJ's Criminal Division prosecutes certain election crimes. But its responsibilities are "limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct." *Id.* § 9-85.300 (2022). The Criminal Division enjoys no authority to interfere with state election procedures on its own initiative, and not in relation to another branch's constitutionally authorized act.

At most, DOJ leadership could have delegated Clark authority to take on the responsibilities of the Voting Section or Criminal Division. But Clark points to nothing that shows the executive branch could authorize him to interfere with a state's election results on claimed grounds of voter fraud.

### IV.    Clark's charged conduct was not related to his offices.

For Clark to get access to federal court, he must establish some "causal connection" between his acts and the scope of his office. *Meadows*, 88 F.4th at 1343. We have recognized that "the bar for proof is 'quite low.'" *Id.* at 1348 (quoting *Caver v. Cent Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017)). Still, the removing party "must be 'specific and positive' in showing that his charged conduct 'was confined to his acts as an officer.'" *Id.* (quoting *Symes*,

286 U.S. at 520). And when the removing party is a criminal defendant, we've said, "a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Id.* (quoting *Willingham*, 395 U.S. at 409 n.4).

So Clark had "to support the factual averments linking his conduct and his office 'by competent proof.'" *Id.* (quoting *United Food & Com. Workers Union v. Ctr. Mark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994)). And in assessing that proof, "the district court was entitled to evaluate the demeanor and presentation of witnesses, assess the credibility of testimony . . . , and weigh competing evidence." *Id.*

All told, Clark did not present much evidence to show that his actions—drafting a letter to influence state election procedures—related to his offices. His principal two pieces of evidence included an affidavit by former Attorney General Edwin Meese III and a personal affidavit.

Meese offered the opinion that Assistant Attorneys General can be shuffled and delegated more responsibility beyond their Divisions. The district court accepted this legal conclusion. But as I've noted, the district court still concluded that Clark did not show he had in fact been delegated election-related issues.

Clark's personal affidavit also provides little support linking his letter to his office. The district court excluded it from evidence, noting that even if it were to consider the Clark affidavit, it would give the affidavit only "slight" weight because of the affidavit's

"clear self-interest" and the fact "that it was not subject to cross-examination."[5]

On the other side of the ledger, Clark faced substantial evidence suggesting his letter did not relate to his duties. The Acting Attorney General found it "strange" Clark was working on election issues. And Acting Deputy Attorney General Donoghue told Clark it was not the DOJ's role to offer "recommendations to a State Legislature about how they should meet their Constitutional obligation to appoint Electors." Clark's subordinate, tasked with drafting the letter, was also "shocked" by an election-related assignment.

In sum, Clark's letter sought to instruct a state on its own election procedures. But Clark did not establish that his offices authorized this activity. That dooms his removal effort.

Worse still, as I've explained, Clark's alleged actions exceeded the authority of the Justice Department as a whole. So he

---

[5] The district court also addressed one of the main arguments the affidavit supported. Clark was named counsel in a suit to defend Vice President Mike Pence and other officials in their conduct surrounding the 2020 election. He argued that litigation shows his portfolio contained election issues. But the district court found more credible former Assistant Attorney General Hunt's explanation of that litigation. Hunt testified that when officials are sued in their official capacities, the Civil Division has the responsibility to defend the suit, no matter the subject matter. In other words, the litigation was defensive, while Clark's charged conduct, drafting a letter directed at Georgia officials, offensively sought to interfere with valid state election procedures. And that wasn't something within the Department's authority. Again, nothing in the record supports the conclusion that the district court's factual finding was clearly erroneous.

has failed to show "a 'causal connection between the charged conduct and asserted official authority'" necessary to qualify for federal-officer removal under section 1442(a)(1).

## V.    Conclusion

Congress allows federal officers to remove their cases from state to federal court to protect the performance of their lawful duties. But Georgia did not charge Clark for acts he undertook within his responsibilities as an Acting Assistant Attorney General. So even if the federal-officer removal statute applied to former federal officers, he would still not be entitled to removal of the Georgia action under the federal-officer removal statute.

23-13368                GRANT, J., Concurring                1

GRANT, Circuit Judge, Concurring:

For the reasons outlined in my separate opinion in *Georgia v. Shafer*, No. 23-13360 (11th Cir. 2024), I respectfully concur.